**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
MANUEL ALVAREZ, SR., *on behalf of himself*
*and others similarly situated*,


                  *Plaintiff*,                       **MEMORANDUM**
                                                **AND ORDER**
                                    19-cv-3343 (JS) (JMW)


            *-against-*


EXPERIAN INFORMATION SOLUTIONS, INC.,


                  *Defendant*.

-------------------------------------------------------------X
**A P P E A R A N C E S :**

        Daniel Zemel, Esq.
        Elizabeth Easley Apostola, Esq.
        **Zemel Law LLC**
        660 Broadway
        Paterson, NJ 07514
        *Attorneys for Plaintiff*

        James A. Francis, Esq.
        John Soumilas, Esq.
        Lauren Kw Brennan, Esq.
        Edward Skipton, Esq.
        Jordan M. Sartell, Esq.
        **Francis Mailman Soumilas P.C.**
        1600 Market Street, Suite 2510
        Philadelphia, PA 19103
        *Attorneys for Plaintiff Alvarez and*
        *Proposed Intervenor Plaintiff Ahmad Khalil*

        Kerianne Tobitsch, Esq.
        **Jones Day**
        250 Vesey Street
        New York, NY 10281
        *Attorney for Defendant*

Kerry Cordill Fowler, Esq.
**Jones Day**
555 S. Flower St., 50th Fl.
Los Angeles, CA 90071
*Attorney for Defendant*

**WICKS**, Magistrate Judge:

Plaintiff Manuel Alvarez ("Plaintiff" or "Alvarez") commenced this consumer class action on June 5, 2019 alleging that Defendant Experian Information Solutions, Inc. ("Defendant" or "Experian") violated the Fair Credit Reporting Act, 15 U.S.C. §§ 1681-1681x ("FCRA"), and the New York Fair Credit Reporting Act ("NYFCRA"), NY Gen Bus. Law §§ 380 *et seq*., by improperly associating customers with terrorists, narcotics traffickers, money launderers, arms dealers, and other like-minded criminals. (*See* ECF No. 1.) On March 15, 2023, the undersigned issued a Memorandum and Order staying the action pending arbitration (*see Alvarez v. Experian Information Solutions, Inc*., 661 F. Supp. 18 (E.D.N.Y. 2023)), which was affirmed by the Hon. Joanna Seybert on August 2, 2024. *See* ECF No. 98 ("Consistent with the March 2023 Order, this action REMAINS STAYED pending arbitration"). Now before the Court, on referral from District Judge Seybert (*see* Electronic Order dated October 9, 2024), is Ahmad Khalil ("Prospective Plaintiff" or "Khalil"), and Lead Plaintiff Alvarez's Motion to Intervene Khalil as lead plaintiff and class representative in the action (ECF Nos. 99, 103), which is opposed by Defendant (ECF No. 101). For the reasons stated herein, Prospective Plaintiff Ahmad Khalil's Motion to Intervene as Lead Plaintiff (ECF No. 99) is **DENIED**.

## BACKGROUND

### I.    Factual Background

Plaintiff commenced this action alleging that Experian sold a consumer credit report to his prospective loan lender that inaccurately identified him as a person listed on the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") List. (ECF No. 1 at ¶¶ 40-50.) Plaintiff

further alleges that this error delayed approval of his mortgage application, resulting in out-of-pocket costs including additional rent payments, and other damages including harm to reputation and emotional distress. (*Id.* at ¶ 51.)

Specifically, the operative Complaint alleges OFAC "administers and enforces economic trade sanctions based on U.S. foreign policy and national security goals against threats to national security, foreign policy or economy of the United States[,]" and "directs those sanctions at, among others, terrorists, international narcotics traffickers, and persons involved in the proliferation of weapons of mass destruction," and publishes a list of those "Specially Designated Nationals" ("SDNs") and "Blocked Persons" on its website (hereafter, the "OFAC List"). (*Id.* at ¶¶ 8-11.)[1] Persons on the OFAC List: (i) are legally ineligible for credit in the United States, (ii) may not be employed, (iii) may even be subject to deportation or criminal prosecution, and (iv) are generally prohibited from doing business with, including extending credit to, individuals on the OFAC List. (*Id.* at ¶¶ 10, 12.)

Plaintiff alleges Experian offers a product called the "Experian OFAC Name Matching Service" which includes OFAC information on the consumer reports Experian compiles and sells, and Experian's "Name Matching Service" includes OFAC information on consumer reports using only first and last name as a matter of standardized practice. (*Id.* at ¶¶ 25-26.) Plaintiff alleges Experian: (i) fails to follow reasonable procedures to assure the maximum possible accuracy of the OFAC information it sells about consumers, regularly making inaccurate associations between innocent people with criminals on the OFAC list (*id.* at ¶ 27), (ii) fails to use all of the available information about consumers to determine whether to associate them with criminal on the OFAC list and does not use the available information to rule out clear mismatches (*id.* at ¶ 29), (iii)

---

[1] The full OFAC List as maintained by the Treasury Department is publicly available information, and whether a person is on the OFAC List is a matter of public record. (*Id.* at ¶ 11.)

employs procedures that maximize the likelihood of a match between a data on the OFAC list and consumers, compromising accuracy (*id*. at ¶ 31), (iv) does not provide any notification to consumers who are the subject of reports containing reference to the OFAC list that such information is being reported, or the name and contact information of the person to whom the information is reported (*id*. at ¶ 32), and (v) does not maintain reasonable procedures to ensure that OFAC information on its reports is complete and up to date, in violation of the FCRA and NYFCRA.

Plaintiff Alvarez, a resident of Long Island, New York, sought to purchase a house in Nassau County, New York in the Spring of 2018, and arranged for mortgage financing through Carrington Mortgage, and was granted pre-approval. (*Id*. at ¶¶ 37-38.) Alvarez moved forward with the purchase of the home, and the sale was set to close on or about May 1, 2018. (*Id*. at ¶ 39.) On or about April 26, 2018, Experian sold a consumer report about Plaintiff which was delivered to his prospective lender, Carrington Mortgage. (*Id*. at ¶ 40.) In connection with the April 26, 2018 consumer report, Experian received Plaintiff's full name, data of birth, address, and social security number, and included on its April 26, 2018 report information pursuant to its OFAC Name Matching Service, stating that "Name Matches OFAC/PLC/FSE LIST." (*Id*. at ¶¶ 41-42.)

Plaintiff Alvarez asserts he is not on the OFAC list or any other government watch list, and his name does not match any name on the OFAC SDN list, and, despite having been provided with Plaintiff's full name, address, social security number, and date of birth, Experian used a loose name-only match to determine whether to include the OFAC information on the consumer report. (*Id*. at ¶¶ 44-45.) A representative of Carrington Mortgage subsequently informed Plaintiff that it could not move forward with the loan because of the appearance of the OFAC information on the consumer report. (*Id*. at ¶ 46.) Plaintiff contacted Experian via telephone to dispute the inaccurate

OFAC information on several occasions in late April and early May 2018, however, the Experian representatives claimed to know nothing about OFAC. (*Id*. at ¶ 47.) As a result of Experian's "inaccurate and incomplete reporting of the OFAC information," Alvarez asserts he was forced to delay closing on the property for approximately six (6) weeks and incur out of pocket costs including additional rent payments, and also sustained other damages including harm to reputation and emotional distress. (*Id*. at ¶ 51.)

ConsumerInfo.com, Inc. ("ECS") is a corporate affiliate of Experian, both wholly owned by Experian Holdings, Inc., and share the same parent company Experian plc. (*See* ECF No. 76 at ¶ 2.) ECS offers consumers various services including "CreditWorks," which is a credit monitoring service. On July 10, 2019, Plaintiff consented to ECS' Terms of Use ("TOU") (ECF No. 76-3) when he signed up for CreditWorks for credit monitoring. He then received a copy of his Experian credit report through ECS. (ECF No. 78 at 3-4.) The TOU contains an arbitration provision ("Arbitration Agreement"). (ECF No. 76-3 at 4.) The Arbitration Agreement provides in relevant part that "ECS and you agree to arbitrate all disputes and claims between us arising out of this Agreement directly related to the Services or Websites" and:

> The agreement to arbitrate includes, but is not limited to: claims arising out of or relating to any aspect of the relationship between us arising out of any Service or Website, whether based in contract, tort, statute (including, without limitation, the Credit Repair Organizations Act) fraud, misrepresentation or any other legal theory; claims that arose before this or any prior Agreement (including, but not limited to, claims relating to advertising); claims that are currently the subject of purported class action litigation in which you are not a member of a certified class; and claims that may arise after the termination of this Agreement.

(ECF No. 76-3 at 4.) The Arbitration Agreement also states that:

> [R]eferences to 'ECS,' 'you,' and 'us' shall include our respective parent entities, subsidiaries, affiliates (including, without limitation, our service provider, CSID), agents, employees, predecessors in interest, successors and assigns, websites of the foregoing, as well as all authorized or unauthorized users or beneficiaries of Services and/or Websites or

information under this or prior Agreements between us relating to Services and/or Websites.

(ECF No. 76-3 at 4.) Moreover, the Delegation Clause of the Arbitration Agreement provides:

All issues are for the arbitrator to decide, including the scope and enforceability of this arbitration provision as well as the Agreement's other terms and conditions, and the arbitrator shall have exclusive authority to resolve any such dispute relating to the scope and enforceability of this arbitration provision or any other term of this Agreement including, but not limited to any claim that all or any part of this arbitration provision or Agreement is void or voidable.

(ECF No. 76-3 at 5-6.)

Plaintiff asserts Prospective Plaintiff Khalil is a "member of a class of innocent credit applicants about whom Defendant sold credit reports that included false and misleading information pursuant to its OFAC Name Matching service, which stated that he (like other class members) was a match to a government watchlist of terrorists and other criminals." (ECF No. 99 at 4; *see generally* ECF No. 1.)[2] Unlike Plaintiff Alvarez, however, Prospective Plaintiff Khalil alleges he never entered into an agreement to arbitrate any claims with Defendant or any Experian-related entity. Specifically, Prospective Plaintiff Khalil, a resident of Racho Viejo, Texas (*see* ECF No. 99-1 at ¶ 3), alleges as follows:

In or around late 2020 or early 2021, Plaintiff Khalil applied to refinance his mortgage with the Bank of Whittier, N.A. ("Whittier"). In association with this application, Experian sold a consumer report about [him] which was delivered to Whitter in November 2020. In connection with the November 2020 consumer report, Experian received Plaintiff Khalil's full name, date of birth, address, and social security number. Experian included on its November 2020 report information pursuant to its OFAC Name Matching Service.

Plaintiff Khalil is not on the OFAC list or any other government watch list. Despite having been provided with Plaintiff Khalil's full name, address, social security number, and date of birth, Experian used a loose name-only match to determine whether to include the OFAC information on the consumer report. As a result of Experian's inaccurate and incomplete reporting of the OFAC information, Plaintiff Khalil sustained damages including harm to reputation and emotional distress.

---

[2] Allegations specific to Khalil are articulated in Plaintiff's Proposed Amended Complaint (hereafter, the "PAC") at ECF Nos. 99-1 at ¶¶ 52-58 (PAC) and 99-2 at ¶¶ 52-58 (PAC with redline).

(*Id*. at ¶¶ 52-58.)

## II.    Procedural History

Plaintiff filed the Complaint on June 5, 2019, and Experian filed its Answer on July 25, 2019. (ECF No. 1, 6.) An initial conference was held, and a Scheduling Order (ECF No. 15) was entered on October 8, 2019. The parties then engaged in limited discovery related to the merits of the case and class certification. On March 30, 2021, Plaintiff moved to compel nationwide class data from Experian. (ECF No. 45.) In the parties' April 2, 2021 Joint Proposed Scheduling Order, Experian noted its intent to file a motion to compel arbitration (ECF No. 46), which motion was made on April 4, 2021. (ECF Nos. 48-51.) On April 5, 2021, the Court granted Plaintiff's motion to compel nationwide class data and ordered Experian to provide responsive class data information on or before April 26, 2021. (ECF No. 52.) On April 20, 2021, the Court denied Experian's motion to compel arbitration without prejudice to allow for discovery related to arbitration, with a deadline to complete such discovery by June 19, 2021. (Electronic Order dated April 20, 2021.)

On April 22, 2021, Experian moved to stay discovery which the Court granted, except as to the limited class-certification and arbitration-related discovery that the Court previously ordered to be completed. (ECF No. 63.) The Court noted the stay would expire upon the Court's resolution of the motion to compel arbitration and, if the motion is denied, the Court was to schedule an immediate conference to finalize a schedule for any remaining merits and class certification discovery. *Alvarez v. Experian Information Solutions, Inc*., 2021 WL 2349370 (E.D.N.Y. June 7, 2021) (ECF No. 63). The parties subsequently decided to pursue mediation and moved to stay all proceedings and deadlines but preserved their respective arguments regarding Experian's anticipated motion to compel arbitration. (ECF No. 66.) The Court granted the stay. (ECF No. 67.)

Once mediation proved unsuccessful, the Court entered a briefing schedule on Experian's motion to compel arbitration. (Electronic Order dated November 12, 2021.)

On March 1, 2022, Experian then filed its motion to compel arbitration and stay proceedings (ECF No. 72) pursuant to the Federal Arbitration Act ("FAA") 9 U.S.C. §§ 3, 4, which Plaintiff opposed (ECF No. 78). On March 15, 2023, the undersigned granted Experian's motion to compel arbitration, and stayed the case pending arbitration. *See Alvarez v. Experian Information Solutions, Inc.*, 661 F. Supp. 18 (E.D.N.Y. 2023). Plaintiff appealed the undersigned's decision which was later affirmed by District Judge Seybert on August 2, 2024. (ECF No. 98.) On August 15, 2024, Plaintiff and Prospective Plaintiff filed a Motion for Ahmad Khalil to Intervene as Lead Plaintiff in the action. (ECF No. 99.) On September 19, 2024, Experian filed its Response in Opposition (ECF No. 101). On October 9, 2024, Judge Seybert referred the Motion to the undersigned for decision. (*See* Electronic Order dated October 9, 2024.) Plaintiff and Prospective Plaintiff filed their Reply in Support on October 21, 2024. (ECF No. 103.)

## III. The Parties' Contentions

### A. Prospective Plaintiff Khalil's Motion to Intervene

Prospective Plaintiff argues that his Motion to Intervene should be granted because it is timely and otherwise satisfies the requirements of Federal Rule of Civil Procedure 24(a) (*i.e.,* Intervention as of Right) and/or 24(b)(1) (*i.e.*, Permissive Intervention). (ECF No. 99 at 7.) *First*, Prospective Plaintiff argues his motion is timely. Khalil argues he only learned of his claim in this case and that he was a class member when he had privileged discussions with counsel in August 2024, and after this Court's August 2, 2024 decision affirming the undersigned's Order compelling Alvarez to arbitrate his claims with Experian. (*Id.*) Khalil specifically seeks to intervene on behalf of class members without any arbitration agreement and "thereby avoid the significant delay in the

8

resolution of his and those members' claims that waiting for Alvarez to resolve his claims against Defendant in arbitration would otherwise bring about." (*Id*.)

Khalil maintains that any prejudice to existing parties resulting from any potential delay in his application to intervene is negligible because he does not raise any new claims or add new parties in the proposed Amended Complaint (*see* ECF No. 99, Ex. A), and further argues: (i) "despite its age, no motion for class certification has been filed in this matter," (ii) if his motion to intervene is granted, Khalil will promptly respond to discovery request served upon him concerning his claims in this matter and make himself available for deposition, just as Alvarez did, (iii) permitting intervention will cause less prejudice and delay to Defendant as well as to Khalil because he can immediately be the representative plaintiff for any putative class members without arbitration agreements, (iv) rather than require Defendant to separately defend another case, with an entirely new schedule and a new set of discovery requests, intervention will permit the parties, including Defendant, to proceed efficiently, and (iv) there is no prejudice to Mr. Alvarez, whose claims will be pursued separately in arbitration. (*Id*. at 7-8.)

By contrast, Khalil argues the prejudice to him if his application to intervene is denied would be substantial. (*Id*. at 8.) Khalil asserts "[t]his Court's Orders compelling Alvarez's claim to arbitration represent not only a significant prejudice to Prospective Plaintiff but also to the timely resolution of the claims of those putative class members also not subject to any arbitration agreement[,]" and, "[n]ow that Alvarez's claims have been waylaid by the arbitration process, Khalil—unencumbered by any such agreement—is ready and willing to step into the role of class representative to pursue the litigation on behalf of the class in a timely manner . . . to protect his interests (and those of prospective class members)." (*Id*.)

*Second*, Prospective Plaintiff argues he may intervene as of right pursuant to FRCP 24(a). (*Id*. at 9.) Plaintiff identifies that Rule 24(a) "provides that a court must permit the intervention of someone who 'claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest[,]'" (*id*. at 9) (quoting Fed. R. Civ. P. 24(a)(2)), and that Khalil has such an interest and seeks, by intervention, to protect it now that Alvarez's claims have been compelled to arbitration. (*Id*.) Khalil contends that because Defendant subjected him and those he would seek to represent to the same type of transaction as Alvarez, "there is no doubt" that Khalil has the same interest in this action, and Khalil's interest in this action is in jeopardy now that Alvarez's claims have been compelled to arbitration. (*Id*.) While Khalil "has the same ultimate objective" as Plaintiff Alvarez, he maintains that his claim must be pursued in this matter in order to preserve the interests of putative class members without an agreement to arbitrate. (*Id*. at 9-10.) Specifically, Khalil argues "[i]f those claims were forced into separate actions, Defendant could seek to preclude them with a statute of limitations defense[,]" as "[m]any of those in the putative class remain unaware of their consumer reports that contained OFAC information, as Khalil was until his recent discussions with his attorneys." (*Id*.)

*Third*, Prospective Plaintiff argues this Court should permit him to intervene pursuant to FRCP 24(b)(1). (*Id*. at 10.) Khalil identifies that Rule 24(b)(1) provides that a Court may also "permit the intervention of someone who 'has a claim or defense that shares with the main action a common question of law or fact' upon consideration of 'whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.'" (*Id*) (quoting Fed. R. Civ. P. 24(b)(1)(B), 24(b)(3).) Khalil argues he satisfies both prongs of this alternative basis for allowing

Intervention: (i) he contends he shares the same claims brought by Alvarez and relies upon the same set of facts regarding Defendant's standardized practice of including OFAC Name Matching service information on consumer reports, and (ii) he argues intervention will not unduly delay or prejudice either Alvarez's or Defendant's rights, and further notes that "[t]he same discovery that has already been taken with respect to Defendant's practices will all apply equally to the claims of Prospective Plaintiff Khalil as well as to Plaintiff Alvarez." (*Id*.)

### B.    Experian's Response in Opposition

Experian contends Prospective Plaintiff's Motion to Intervene should be denied on two grounds: (i) this Court lacks jurisdiction and venue over Khalil's claims, and (ii) intervention is not permitted under FRCP 24. *See generally*, ECF No. 101. *As to its first point*, Experian argues that the PAC (ECF Nos. 99-1, 99-2): (i) does not establish that the Court has personal jurisdiction over Experian with respect to Khalil's claims; (ii) does not establish that the Eastern District of New York is a proper venue; and (iii) does not establish that Khalil suffered an Article III injury from Experian's alleged misconduct. (ECF No. 101 at 9.) *First*, Experian argues the PAC does not allege sufficient facts to show that the Court has general jurisdiction over Experian—it does not allege Experian's state of incorporation, and it alleges that Experian's principal place of business is in Costa Mesa, California. (*Id*. at 10) (citing ECF No. 99-2 at ¶ 8.) While the PAC generically alleges that Experian "regularly conducts business in the State of New York," (*id*.), Experian maintains "this does not give rise to general jurisdiction." (*Id*.)

Accordingly, Experian maintains Khalil "must establish specific jurisdiction, which requires 'a connection between the forum and the specific claims at issue.'" (*Id*.) (quoting *Bristol-Myers Squibb Co. v. Superior Ct. of California*, 582 U.S. 255, 265 (2017)). Experian argues the

PAC does not allege *any* connection between his claims and the State of New York, rather, "it rules out any such relationship[:]"

> Khalil resides in Racho [*sic*] Viejo, Texas—nowhere near the Empire State. He claims that Experian included "information [about him] pursuant to [Experian's] OFAC Name Matching Service" on a consumer report it sold to Whittier in connection with Khalil's efforts to refinance his mortgage. Whittier has just two locations, one in Whittier, California, and one in Richardson, Texas. From all that Khalil has alleged, his claims against Experian have nothing to do with New York.

(*Id*) (internal citations omitted). Experian contends that while Alvarez*'s* claims may "clear the bar for personal jurisdiction, as the [PAC] continues to allege that he resides on Long Island, and that a supposedly inaccurate Experian consumer report inhibited his ability to purchase a house in Nassau County . . .   Khalil's claims cannot piggyback on Alvarez's." (*Id*. at  10-11) (quoting *Chufen Chen v. Dunkin' Brands, Inc.*, No. 17-CV-3808-CBA-RER, 2018 WL 9346682, at *5 (E.D.N.Y. Sept. 17, 2018), *aff'd*, 954 F.3d 492 (2d Cir. 2020)) ("As other courts have held, *Bristol-Myers Squibb* means that 'each named plaintiff in a purported class action must show that in-state contacts specific to their claim give rise to specific jurisdiction over an out-of-state defendant,' whether or not *other* named plaintiffs have validly brought suit.").

*Second*, Experian argues that the Eastern District of New York is not the proper venue for Khalil's claims. (*Id*. at 11.) Under the first prong of the federal venue statute, Experian identifies that "a civil suit is proper in 'a judicial district where any defendant resides,' and a corporate defendant like Experian is deemed to reside 'in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question,'" and, because, according to Experian, this Court lacks personal jurisdiction over Experian with respect to Khalil's putative claims, it is not the proper venue under § 1391(b)(1). (*Id*. at 11-12) (citing 28 U.S.C. § 1391(b)(1), (c)(2)). Experian additionally identifies that "[v]enue is also proper in 'a judicial district in which a substantial part of the events or omissions giving rise to the claim

occurred[,]'" however, "Khalil can't satisfy this prong of the venue test either[,]" as "Khalil lives in Texas, and [the PAC] provides no reason to believe that his claim against Experian has anything to do with New York." (*Id*. at 12) (quoting 28 U.S.C. § 1391(b)(2)).

*Third*, Experian argues that Khalil lacks Article III standing to intervene in this case because the PAC fails to allege, he experienced a "'concrete'" injury in fact— that is, 'real, and not abstract.'" (*Id*. at 13) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)). Specifically, Experian contends the PAC contains "no allegation that the consumer report Experian supposedly delivered to Whittier resulted in any adverse action against Khalil, such as a denial of credit. . . [n]or does Khalil allege any other kind of monetary harm; he does not claim (for instance) that he was forced to delay closing on his property and incurred additional rent expenses because of an allegedly false consumer report, as Alvarez does." (*Id*.) (citing ECF No. 99-2 at ¶ 51.) Experian argues Khalil's Motion to Intervene concedes that "Khalil was not even aware of the purported violation until counsel informed him of it . . . further suggesting that he suffered no tangible consequences as a result of Experian's report." (*Id*.)

Experian further argues that the PAC "does not allege that Experian classified [Khalil] as a potential terrorist; rather, [it] says only that 'Experian included on its November 2020 report information pursuant to its OFAC Name Matching Service.'" (*Id*. at 14) (quoting ECF No. 99-2 at ¶ 55.) Experian maintains "[t]his allegation is deliberately vague about what information was on the consumer report provided to Whittier. . . [i]ndeed, as alleged, the report might have labeled Khalil as having a name *similar* to one on the OFAC List, or might have stated that he wasn't a match at all . . . [t]hus, it is not even clear from Khalil's allegations that the consumer report contained inaccurate information—let alone *defamatory* information." (*Id*.) Experian claims Khalil "makes no allegation that Whittier paid any mind to the OFAC information; to the contrary,

since the OFAC information appears not to have had any consequences of any kind, the most plausible explanation is that Whittier either did not read, understand, or consider that information." (*Id*.) To this end, because Khalil has not made "specific allegations of reputational or monetary harm," Experian maintains he lacks constitutional standing and cannot intervene in this action. (*Id*. at 15.)

*With respect to its second point*, Experian argues that Khalil's Motion to Intervene is otherwise not permitted under FRCP 24. (*Id*.) *First*, Experian argues Khalil's Motion is untimely:

> Experian moved to compel arbitration *in April 2021*; since (at least) then, counsel has known that Alvarez would not likely be able to act as class representative. The alarm bells should have rung even louder when [the undersigned] granted Experian's motion nearly a year and a half ago. And while counsel may have hoped that this Court would reverse that order, counsel must have known (or at least should have known) those hopes were slim: Experian has compelled arbitration in countless analogous cases across the country, and [the undersigned's] order joining those ranks could be overturned only if found to have been an abuse of discretion or based on clearly erroneous factual findings. In all this time, however, counsel still made no efforts at intervention. Instead, putative class counsel chose to file a substantially identical class action in California in April 2022, where the parties have since completed class-certification and summary judgment briefing. Counsel's untimely effort to now take a third bite at the apple should not be allowed.

(*Id*. at 17-18) (emphasis in original) (internal citations omitted) (cleaned up). *Second*, Experian argues that Kahlil's intervention would prejudice it. (*Id*. at 19.) Specifically, Experian contends granting Kahlil's Motion would require the taking of additional discovery into the suitability of Khalil to serve as class representative, which will in a further delay in these proceedings and prejudice to Experian, particularly in terms of additional attorneys' fees and legal expenses. (*Id*. at 19.) Experian argues it has already expended significant resources to assess and discover information about Alvarez's ability to act as a class representative, including multiple depositions of persons with knowledge of Alvarez's claim, and, to require Experian to repeat these discovery efforts as to Khalil is unfairly prejudicial, particularly in light of the "many-years-long delay brought about by class counsel's dilatory efforts." (*Id*.) Experian challenges Plaintiff's contention

that Experian will suffer no prejudice because Khalil does not raise any new claims. (*Id*. at 20.) Experian maintains the PAC "*does* raise new claims—[Kahlil's] *own*, based on Experian's alleged reporting about him rather than its alleged reporting about Alvarez." (*Id*.) (emphasis in original) (quoting ECF No. 99-2 at ¶¶ 52–58.)

*Third*, Experian maintains that denying intervention would not prejudice Kahlil. (*Id*. at 21.) Experian contends that Plaintiff's concerns about delay are misplaced because Khalil could likely get a speedier resolution of his claims if intervention were denied – if Khalil intervenes, the parties will have to litigate class certification, which will consume years in discovery, motions briefing, and (potentially) interlocutory appeal, and, by contrast, if intervention is denied, Khalil can bring his claims on an individual basis and avoid protracted class-certification disputes – therefore, from a timing perspective, "there is every reason to believe Khalil would be better served by filing an individual lawsuit." (*Id*. at 21-22) ("Moreover, like Khalil, other putative class members can likely attain a speedier resolution by bringing individual suits rather than awaiting the class-certification process.").

*Fourth*, Experian argues that unusual circumstances "reinforce the Motion's untimeliness." (*Id*. at 22.) Experian challenges Plaintiff's contention that intervention is timely because Experian, despite litigating the case for nearly two years, suddenly discovered the agreement that a remote Experian 'affiliate' had agreed with Alvarez to arbitrate and moved to compel the arbitration – and argues "[t]his worn-out attempt to blame Experian for not becoming aware of the arbitration agreement sooner has been rejected by both [the undersigned] and this Court." (*Id*.) (citing ECF No. 90 at 19–21; ECF No. 98 at 21.) Even if Experian's discovery of the arbitration agreement could be described as an "unusual circumstance," Experian argues that "discovery (and Experian's

prompt motion to compel) occurred in early *2021*[,]" is "hardly an excuse for delaying an intervention motion until August *2024*." (*Id*.) (emphasis in original).[3]

*Finally*, Experian contends that the Motion to Intervene is "unnecessary" because: (i) the Court has not certified a class, so Khalil is not a party to this action, and nothing that happens in it can affect Khalil's (or any other putative class member's) ability to assert claims in a separate lawsuit, and (ii) if Khalil's claims—or the claims of any other putative class member—were timely when Alvarez filed suit, they can assert those claims on an individual basis without a statute-of-limitations barrier and their interests would not be impaired. (*Id*. at 24-25.)

### C.    Plaintiff's Reply in Support

In his Reply, Plaintiff contends that: (i) that the Court has both personal jurisdiction over Experian and subject matter jurisdiction over Prospective Plaintiff's claims, and venue is otherwise proper, and (ii) intervention is proper under Rule 24 because Prospective Plaintiff's motion is timely and "continuation in this case is preferable to duplicative litigation." (*See generally*, ECF No. 103.) *With respect to his first point*, Plaintiff first argues that this Court "continues to exercise jurisdiction over Experian." (*Id*. at 6.) Plaintiff contends that "Experian, one of the largest consumer reporting agencies in the U.S., unquestionably operates in the State of New York[,]" and "the claims Mr. Khalil seeks to vindicate . . .address Experian's uniform practices for misreporting

---

[3] Experian goes further to question the circumstances surrounding Plaintiff's counsel's representation of Khalil. (*Id*. at 23.) Experian suggests that Khalil was solicited by class counsel because Khalil alleges to have "learned of his claim in this case and that he was a class member when he had privileged discussions with counsel within the last few days," and he thereafter "executed a class representation agreement." (*Id*.) Experian argues this was not a situation in which counsel reached out to Khalil to "obtain information about the merits of the case" or "uncover information that may be relevant to whether or not a class should be certified[,]" rather, "Counsel had these 'discussions' with Khalil mere 'days' after their lead plaintiff was sent to arbitration, which makes apparent that Khalil was directly targeted by counsel in order to join the lawsuit and thereby save their class action." (*Id*.) (internal citations omitted). Experian claims authorizing intervention under such circumstances would reward Counsel's "potentially questionable (and certainly dilatory) tactics." (*Id*.) Plaintiff rejects Experian's suggestion that counsel in this case engaged in improper solicitation of Mr. Khalil because "[t]here is no support or basis for that bald contention." (ECF No. 103 at 12.)

consumers as 'matches' to the OFAC list – practices which are applied nationwide including in thousands of credit transactions in the State of New York concerning New York consumers." (*Id.*) Even if all of Experian's acts with respect to the alleged inaccurate OFAC alerts at issue in this case are outside of New York, Plaintiff maintains "they plainly and foreseeably have consequences in New York in the form of the publication of defamatory credit reports." (*Id.*)

*Second*, Plaintiff contends Mr. Khalil "need not demonstrate an independent basis for venue in this Court in order to intervene." (*Id.* at 7.) Plaintiff asserts that venue is proper anywhere that personal jurisdiction is satisfied, and, according to Plaintiff, personal jurisdiction is satisfied here. (*Id.*) Plaintiff further argues that "[t]ransfer of venue in this case, which has been pending in this Court for five years, would not serve the interests of justice, and would instead unduly require another court to become familiar with the voluminous record and lengthy procedural history in this matter." (*Id.*)

*Third*, Plaintiff argues that Kahlil "need not independently demonstrate Article III standing as an intervening class member[,]" and, in any event, "Mr. Khalil's allegations . . .make clear that he has Article III standing for his claims[:]"

> Mr. Khalil clearly alleges that he was the subject of an Experian report containing an inaccurate OFAC record. Mr. Khalil alleges that Experian's "Name Matching Service" includes OFAC information on consumer reports using only a first and last name, and that he was the subject of such a report. Indeed, Mr. Khalil alleges that Experian's practices with respect to OFAC information are uniform and not unique to each consumer or transaction. Mr. Khalil asserts that the report about him was prepared according to Experian's standardized procedures with respect to OFAC records, which simply state that his "Name Matches OFAC/PLC/FSE LIST" without qualification. Mr. Khalil also specifically alleges that Experian used only his name to produce the OFAC reference on the report. Finally, Mr. Khalil specifically asserts that his is not on any government watch list, confirming the inaccuracy of the inclusion of any OFAC information on a report about him.

(*Id*. at 7-8) (internal citations omitted) (cleaned up). Plaintiff maintains that "these are the very same facts that led the U.S. Supreme Court to easily conclude [in *TransUnion v. Ramirez*, 594

U.S. 413 (2021) ("*TransUnion*")] that consumers had Article III standing where Experian's competitor Trans Union published consumer reports referencing OFAC based upon name-only matches." (*Id.* at 8.) Plaintiff asserts the Supreme Court in *TransUnion* found that whether a class member had Article III standing to recover turned on whether the class member proved at trial that a report containing the misattributed record had been furnished to a third party, and that there was standing for those class members who had an inaccurate report disseminated to a third party, which, according to Plaintiff, is the proposed class in this case: innocent credit applicants whose credit reports provided by Experian to a third party included a false OFAC hit. (*Id.* at 8-9.)[4]

*As to his second point*, Plaintiff argues that Khalil's intervention is proper under Rule 24. (*Id.* at 10.) *First*, Plaintiff argues that Khalil' Motion to Intervene was timely made. (*Id.*) Plaintiff identifies "Second Circuit case law is clear in looking to 'the length of time *the applicant* knew or should have known of [its] interest' in evaluating timeliness." (*Id.*) (citing *MasterCard Intern. Inc. v. Visa Intern. Serv. Ass'n, Inc.*, 471 F.3d 377, 390 (2d Cir 2006) (emphasis added)). And, Plaintiff contends, "[e]ven if counsel's knowledge is relevant to the timeliness of an intervention motion, the position Experian urges, which would require an intervention motion any time there is mere risk that a proposed class representative *may* be inadequate is untenable and not supported by case law." (*Id.*) Because Rule 24(a)intervention requires a class member to demonstrate that the existing class representative is inadequate, Plaintiff argues that "Experian's position would require counsel

---

[4] Plaintiff further contends that *TransUnion* did not require any further evidence regarding what happened after dissemination of a consumer report containing a misattributed OFAC record to find standing and found that Article III's concrete harm requirement was satisfied based upon dissemination alone. (*Id.* at 9.) To this end, Plaintiff maintains Experian's "citations to the contrary are either nonbinding, premised upon highly divergent facts, or both." (*Id.*) Plaintiff argues that "Mr. Khalil and all members of the proposed class here had an experience identical to the 1,853 class members easily found to have standing in *TransUnion*: they were the subjects of credit reports to third parties bearing faulty OFAC hits based on nothing more than a name match[,] and, "[l]ike those class members, Mr. Khalil has satisfied Article III standing." (*Id.*)

to actively undermine the adequacy of their existing client, rather than advocate for his or her interests, in contradiction to their ethical obligations." (*Id.*) Plaintiff maintains that courts in this Circuit "measure the timeliness of an intervention motion from when the existing class representative's inadequacy is apparent and established, not simply at risk." (*Id.*) (citing *Guadagna v. Zucker*, 2021 WL 4150802, at *5 (E.D.N.Y. July 9, 2021) and *NYTDA, Inc. v. City of New York*, 2014 WL 4274219, at *4 (E.D.N.Y. Aug. 28, 2014)).[5] Plaintiff maintains it implausible that Plaintiff Alvarez and his counsel "should have known that Experian's attempt to compel arbitration would have succeeded, notwithstanding the existence of numerous well-founded arguments to the contrary." (*Id.* at 11.)

Plaintiff argues that Experian's assertions of prejudice "amount to little more than a complaint that it must continue to defend against meritorious claims even after belatedly forcing Plaintiff Alvarez into arbitration[,]" which is "insufficient" because "'[s]tarting a litigation all over again does not constitute legal prejudice." (*Id.*) (quoting *D'alto v. Dahon Ca., Inc.*, 100 F.3d 381, 283 (2d Cir. 1996)). Plaintiff rejects Experian's argument that intervention at this point would render the discovery taken to date "meaningless" because "nearly all of the discovery necessary to present class certification and even merits arguments in this case has already been conducted" and "[a]ny litigation concerning Mr. Khalil's adequacy and typicality would be far from extensive or

---

[5] Plaintiff contends that Experian's reliance on *T.C. v. New York State Dept. of Health*, 2024 WL 689503 (S.D.N.Y. Feb. 20, 2024) ("*T.C.*") is misplaced for three reasons: *first*, "unlike this case where Plaintiff Alvarez and his counsel have vigorously advocated for his ability to continue to represent the proposed class, there was no dispute in *T.C.* that the class representatives' claims were moot," *second*, "in contrast the present motion which is based only upon Mr. Khalil's knowledge, the motion to intervene in *T.C.* involved explicit representations in the motion to intervene by counsel regarding their efforts to identify replacement class representatives[,]" and *third*, "the decision in *T.C.* was founded in part upon the court's skepticism that any class could be certified in light of the divergent facts presented by the proposed intervenors' circumstances . . . [t]he opposite is true here given the uniformity of Experian's practices, and the fact that virtually all courts to address the same claims have granted class certification." (*Id.* at 10-11.)

laborious as Experian asserts." (*Id*. at 12.) By contrast, Plaintiff maintains requiring Mr. Khalil to file a new lawsuit, and for the parties to retake all of the discovery already conducted to date, would be "truly laborious and [a] wasteful result." (*Id*.) Plaintiff argues that denial of Khalil's intervention could prejudice his ability to represent a class, and "would certainly prejudice the interests of thousands of class members who are not even aware of the pendency of this action." (*Id.*) ("Experian's suggestion that individual resolution would be 'speedier' is simply a premature class certification argument in disguise and runs contrary to the numerous cases finding that class treatment of identical claims is superior to individual litigation.").

### MOTIONS TO INTERVENE: *THE LEGAL FRAMEWORK*

Pursuant to FRCP 24, a party may intervene in a civil case either as a matter of right or on a permissive basis.  *See* Fed. R. Civ. P. 24.  Intervention is appropriate as matter of right if the party seeking to intervene:

> [c]laims an interest relating to the property or transaction that is the subject of the action and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Fed. R. Civ. P. 24(a)(2).

"To intervene as of right under Federal Rule of Civil Procedure 24(a)(2), 'an applicant must (1) timely file an application, (2) show an interest in the action, (3) demonstrate that the interest may be impaired by the disposition of the action, and (4) show that the interest is not protected adequately by the parties to the action.'"  *See Griffin v. Sheeran*, 767 F. App'x 129, 132 (2d Cir. 2019) (quotation omitted) (summary order*); In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2024 WL 4673877, at *5 (E.D.N.Y. Nov. 5, 2024) ("Failure to satisfy any one of these requirements is sufficient to deny the application.").

"Under Fed. R. Civ. P. 24(b)(1)(B), the court may permit intervention for a party who makes a 'timely motion' and 'has a claim or defense that shares with the main action a common question of law or fact.'" *Id.* (quoting Fed. R. Civ P. 24(b)(1)(B)). "Permissive intervention is 'within the court's broad discretion.' *Id.* (quoting *Dorsett v. Cnty. of Nassau*, 289 F.R.D. 54, 70 (E.D.N.Y. 2012)). "In addition to the Rule 24(a)(2) factors, 'the court must consider whether permissive intervention will unduly delay or prejudice the adjudication of the original parties' rights.'" *Id.* (quoting *Sylla v. Amazon Lab. Union*, No. 23-CV-05261 (AMD) (TAM), 2024 WL 2079601, at *4 (E.D.N.Y. May 9, 2024)); *Ripple Labs, Inc.,* 20 Civ. 10832 (AT), 2021 U.S. Dist. LEXIS 190855 at *6 (citing Fed. R. Civ. P. 24(b)(3)) (Courts consider the same factors as on a motion to intervene as of right, but also consider "whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights."); *Flowers v. Webb,* 575 F. Supp. 1450, 1458 (E.D.N.Y. 1983) (same); see also *Jones v. Stanford*, 525 F. Supp. 3d 420, 423 (E.D.N.Y. 2021) (quoting 7C Wright & Miller, § 1913) ("This Court has broad discretion in deciding whether to grant permissive intervention. 'It is wholly discretionary with the court whether to allow intervention under Rule 24(b), and even though there is a common question of law or fact, or the requirements of Rule 24(b) are otherwise satisfied, the court may refuse to allow intervention.'")

Under both provisions of Rule 24, the threshold inquiry is whether the application for intervention is timely. *See Floyd v. City of New York*, 302 F.R.D. 69, 84 (S.D.N.Y.), *aff'd in part, appeal dismissed in part,* 770 F.3d 1051 (2d Cir. 2014); *see also Tummino v. Hamburg*, 260 F.R.D. 27, 35 (E.D.N.Y. 2009) (internal citations omitted) (cleaned up) ("Under either test, however, the motion to intervene must be timely. Failure to satisfy *any one* of these requirements is a sufficient ground to deny the application. Thus[,] an untimely motion to intervene must be denied."). "Timeliness under Rule 24 is determined based on factors including '(1) how long the applicant

had notice of the interest before it made the motion to intervene; (2) prejudice to existing parties resulting from any delay; (3) prejudice to the applicant if the motion is denied; and (4) any unusual circumstances militating for or against a finding of timeliness.'" *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2024 WL 4673877, at *5–6 (quoting *United States v. Pitney Bowes*, 25 F.3d 66, 70 (2d Cir. 1994)). "This timeliness assessment must be evaluated against the totality of the circumstances before the court." *Id.* (internal citations omitted). "As to both intervention of right and permissive intervention, Fed. R. Civ. P. 24(c) requires the movant to 'state the grounds for intervention' and attach a 'pleading that sets out the claim or defense for which intervention is sought.'" *Id.* (quoting Fed. R. Civ. P. 24(c)).

It is against this backdrop that the Court considers Prospective Plaintiff's application.

## DISCUSSION

"Because intervenors are not parties to the underlying action, 'the threshold (and ultimately dispositive) question' is whether they may properly intervene." *Tummino v. Hamburg*, 260 F.R.D. 27, 30 (E.D.N.Y. 2009) (quoting *Farmland Dairies v. Comm'r of New York State Dep't of Agric. and Mkts.,* 847 F.2d 1038, 1043 (2d Cir.1988)). Here, for the reasons set forth below, the undersigned finds: (i) this Court lacks jurisdiction and venue is improper over Prospective Plaintiff Khalil's claims; and (ii) his application for intervention is otherwise untimely under Rule 24. Accordingly, his application is denied.

## I.    Jurisdiction and Venue

### A.    Subject Matter Jurisdiction

"While the Second Circuit does not ordinarily require intervenors to establish their own standing, 'an intervenor's right to continue a suit *in the absence of the party on whose side intervention was permitted* is contingent upon a showing by the intervenor that he fulfills the

22

requirements of Art. III." *Tummino*, 260 F.R.D. at 30–31 (quoting *Diamond v. Charles,* 476 U.S. 54, 68 (1986)) (emphasis original).  To this end, because Plaintiff Alvarez has been compelled to arbitration and cannot litigate the instant action in this Court while the stay is in place, Prospective Plaintiff Khalil must demonstrate standing in his own right. *See id.* ("[B]ecause the party on whose side intervention could have been sought during the course of the litigation has decided not to appeal, intervenors must establish that they are sufficiently harmed by the judgment to give them independent standing."); *see, e.g.*, *T.C. v. New York State Dep't of Health*, No. 22-CV-5045 (MKV), 2024 WL 689503, at *7 (S.D.N.Y. Feb. 20, 2024) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) ("*Spokeo*")) (determining whether proposed intervenor had suffered am injury itself and therefore had standing in its own right, and further noting that "'Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing.'").[6]

---

[6] Although Plaintiff Alvarez has not yet moved for class certification in this matter, Prospective Plaintiff Khalil seeks to intervene as Lead Plaintiff to represent the proposed class members. "In the class action context in particular, standing to sue is an essential threshold which must be crossed before any determination as to class representation under Rule 23 can be made. Without standing, one cannot represent a class." *Hines v. Equifax Info. Servs., LLC*, No. 19-CV-6701 (RPK) (RER), 2022 WL 2841909, at *6 (E.D.N.Y. July 16, 2022), *report and recommendation adopted as modified*, No. 19-CV-6701 (RPK) (JAM), 2024 WL 4132333 (E.D.N.Y. Sept. 10, 2024) (internal citations omitted) (cleaned up). "[C]ourts in the class action context focus on the class representative's standing, rather than that of the absent class members." *Id*. "To establish Article III standing in a class action for every named defendant there must be *at least one named plaintiff* who can assert a claim directly against that defendant, and at that point standing is satisfied and only then will the inquiry shift to a class action analysis." *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 159 (2d Cir. 2012) (alterations omitted) (emphasis added). Specifically, the representative plaintiff must show: (1) "that he 'personally has suffered some actual ... injury as a result of the putatively illegal conduct of the defendant,' and (2) that such conduct implicates 'the same set of concerns' as the conduct alleged to have caused injury to other members of the putative class by the same defendants." *Id.* at 162 (alteration in original) (first quoting *Blum v. Yaretsky*, 457 U.S. 991, 999 (1982), then quoting *Gratz v. Bollinger*, 539 U.S. 244, 267 (2003)). Accordingly, because Khalil seeks to intervene as a representative of the proposed class, the Court examines whether he has "demonstrated Article III standing on each of his claims and for each form of relief sought" by a preponderance of the evidence. *Hines*, No. 19-CV-6701 (RPK) (RER), 2022 WL 2841909, at *6; *see also Giammatteo v. Newton*, 452 F. App'x 24, 27 (2d Cir. 2011) ("A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that jurisdiction exists.").

Article III of the Constitution "confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) ("*TransUnion*") (quoting *Raines v. Byrd*, 521 U.S. 811, 819–20 (1997)). The essence or "core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). That is, standing is precisely "what it takes to make a justiciable case." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998). Standing is derived from that limitation and rooted in the "idea of separation of powers." *Allen v. Wright*, 468 U.S. 737, 752 (1984).

The judicial power derived from Article III "exists only to redress or otherwise to protect against injury to the complaining party." *Warth v. Seldin,* 422 U.S. 490, 499 (1975). The "irreducible constitutional minimum of standing" has three elements. *Spokeo*, 578 U.S. at 338. Intervenors bear the burden of proving each element of standing: (i) "that [the plaintiff] suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion*, 141 S. Ct. at 2203 (citing *Lujan*, 504 U.S. at 560–561); *Tummino*, 260 F.R.D. at 30–31. "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U. S. at 339 (quoting *Lujan*, 504 U.S. at 560). A "particularized" injury "must affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1.

In the FCRA context, "the Supreme Court made clear that 'a bare procedural violation, divorced from any concrete harm' fails to satisfy the injury-in-fact requirement of Article III." *Zlotnick v. Equifax Info. Servs., LLC*, 583 F. Supp. 3d 387, 391 (E.D.N.Y. 2022) (quoting *Spokeo*,

24

578 U.S. at 341). *TransUnion*, "another case involving the FCRA, again emphasized that the absence of any allegation of a concrete harm forecloses federal standing[:]"

> *TransUnion* involved a class of 8,185 plaintiffs who alleged that TransUnion, a credit reporting agency, had violated the FCRA via its use of a system that had inaccurately flagged the plaintiffs' credit files as 'potential matches' to persons identified as national security risks by [OFAC]. The Supreme Court ultimately bifurcated the class, finding that 1,853 class members whose inaccurately flagged credit reports had been disseminated to third parties had standing while the other 6,332 class members did not, because 'publication is essential to liability in a suit for defamation.' In short, the Supreme Court held: 'No concrete harm, no standing.'

*Id.*; *Spira v. Trans Union, LLC*, No. 21-CV-2367 (KMK), 2022 WL 2819469, at *3–4 (S.D.N.Y. July 19, 2022) (quoting *TransUnion*, 141 S. Ct. at 2200–09) (cleaned up).

"[A]long with its Second Circuit progeny, *Maddox v. Bank of N.Y. Mellon Tr. Co., N.A.*, 19 F.4th 58 (2d Cir. 2021) ("*Maddox*"),"[7] *TransUnion* "makes clear that plaintiffs who allege only a 'procedural' or 'informational' harm lack standing." *Spira*, No. 21-CV-2367 (KMK), 2022 WL 2819469, at *3. "District courts following *TransUnion* and *Maddox* assessing claims brought pursuant to both the FCRA and the Fair Debt Collection Practices Act ("FDCPA"), an analogous statute, have uniformly held that absent specific allegations of reputational or monetary harm, plaintiffs lack constitutional standing." *Id.* at *4 (internal citations omitted) (collecting cases); *see, e.g.*, *Gross v. TransUnion, LLC*, 607 F. Supp. 3d 269, 273 (E.D.N.Y. 2022) (holding plaintiff's allegations that he "suffered an 'injury to his credit worthiness,' 'increased difficulty obtaining credit,' and 'embarrassment, humiliation, and other emotional injuries'" due to defendant's alleged

---

[7] *Maddox* "involved two plaintiffs who alleged that the Bank of New York Mellon ("BNY Mellon") had failed to file their satisfaction of mortgage within 30 days of the plaintiffs' full satisfaction of their mortgage loan, as required under New York's satisfaction-of-mortgage statutes." *Spira*, No. 21-CV-2367 (KMK), 2022 WL 2819469, at *3 (citing *Maddox*, 19 F.4th at 59–60). In light of *TransUnion*, the Second Circuit ultimately held that "because the mortgagor-plaintiffs failed to allege that they had actually suffered any actionable reputational harm (including or in addition to any adverse credit reporting to third parties) or monetary harm during the lender-defendant's delay in recording the plaintiffs' satisfaction of the mortgage loan, they lacked standing." *Id.* (citing *Maddox*, 19 F.4th at 64-65).

FCRA violations were "conclusory allegations" insufficient to demonstrate standing, as "[t]hey fail[ed] to show how [defendant's] credit alleged error caused plaintiff to suffer a 'concrete and particularized' harm[,]" and further noting "[t]he alleged harms [were] not expenses, costs, any specific lost credit opportunity, or specific emotional injuries."); *Zlotnick*, 583 F. Supp. 3d at 392 ("Where a plaintiff claims that an improper notation on his credit report resulted in a credit score reduction that could cause him reputational and financial harm, the absence of allegations of dissemination to third parties requires dismissal."); *Williams v. Portfolio Recovery Assocs., LLC*, Nos. 21-CV-5662, 21-CV-5968, 2022 WL 256510, at \*3 (E.D.N.Y. Jan. 27, 2022) (allegations that the plaintiffs' inaccurate credit data was provided by the defendant to a third-party vendor, standing alone, were insufficient to confer standing because "no actual tangible harm" was alleged by the plaintiffs).

Here, the Court finds Khalil lacks Article III standing to intervene in this case because the PAC fails to allege he experienced a "concrete injury in fact" that is "'real, and not abstract.'" *TransUnion*, 594 U.S. at 423 (quoting *Spokeo*, 578 U. S. at 340). *First*, while the PAC alleges that Experian sold a consumer report to Whittier containing information regarding Khalil, there are no allegations made that the information contained in the report was misleading, false, or otherwise defamatory. [8] Specifically, the PAC alleges:

---

[8] Court have contemplated that "*TransUnion* stand[s] for the proposition that dissemination alone is sufficient to confer standing[,]" *Torres v. Equifax Info. Servs., LLC*, No. 1:21-CV-2056, 2024 WL 3297843, at \*4 (M.D. Pa. Apr. 17, 2024), however, the information disseminated must have been alleged to be misleading, inaccurate, false, and/or otherwise defamatory such that plaintiff(s) suffered reputational harm. *See TransUnion*, 141 S. Ct. 2190, 2208–09 (internal citations omitted) ("[T]he 1,853 class members (including the named plaintiff Ramirez) whose reports were disseminated to third-party businesses . . . argue that the publication to a third party of a credit report bearing a misleading OFAC alert [*i.e.*, the reports identified consumers as a "*potential* match" to an individual on the OFAC list] injures the subject of the report. The plaintiffs contend that this injury bears a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts—namely, the reputational harm associated with the tort of defamation. We agree with the plaintiffs."). As explained further below, the PAC leaves much to be desired as to the specific information Experian allegedly shared with Whittier regarding Khalil – notably, it fails to allege how and/or if the information was misleading or otherwise inaccurate. *See e.g.*, *Hines*, No.

> [Khalil] applied to refinance his mortgage with [Whittier]. In association with this application, Experian sold a consumer report about [him] which was delivered to Whitter in November 2020. In connection with the November 2020 consumer report, Experian received Plaintiff Khalil's full name, date of birth, address, and social security number. Experian included on its November 2020 report information pursuant to its OFAC Name Matching Service.

*See* ECF No. 99-1 at ¶¶ 52-58; *see also* ECF No. 101 at 14 (quoting ECF No. 99-2 at ¶ 55) (emphasis in original) (The PAC "does not allege that Experian classified [Khalil] as a potential terrorist; rather, [it] says only that 'Experian included on its November 2020 report information pursuant to its OFAC Name Matching Service.' This allegation is [] vague about what information was on the consumer report provided to Whittier. . . [i]ndeed, as alleged, the report might have labeled Khalil as having a name *similar* to one on the OFAC List, or might have stated that he wasn't a match at all . . . [t]hus, it is not [] clear from Khalil's allegations that the consumer report contained inaccurate information—let alone *defamatory* information.").

With respect to this point, the Second Circuit's recent decision issued today in *Phipps v. Experian Information Solution, LLC*, No. 23-7529 (2d Cir. Dec. 6, 2024) (Summary Order) ("*Phipps*"), is illustrative. In *Phipps*, the plaintiff sent numerous letters over the course of several years, first requesting that Experian update the name and address reflected in his credit file, and then later claiming to be a victim of identity theft and requesting that Experian block allegedly fraudulent inquiries on his credit. *Id*. at 1, ¶ 9-11. Experian responded to each of Phipps's letters by providing available avenues of recourse, while also blocking six allegedly fraudulent inquiries. *Id*. at 1, ¶ 11-13. The Second Circuit ultimately affirmed the district court's holding that the

---

19-CV-6701 (RPK) (RER), 2022 WL 2841909, at *9 (emphasis added) ("As recognized in [*TransUnion*] and its progeny, sharing *inaccurate or misleading* information about a consumer may cause traditionally recognized reputational harm that is actionable at law."); *Martinez v. Avantus, LLC*, 343 F.R.D. 254, 263 (D. Conn. 2023) (emphasis added) (plaintiff "clearly suffered an injury in fact as a result of [defendant] publishing his credit report bearing the *misleading* OFAC alert.").

plaintiff failed to demonstrate standing to sue in federal court, because he had not established a

concrete injury traceable to the inaccurate personal information included in Experian's report (*id.*

at 1, ¶ 13-15), reasoning:

> *TransUnion* does not dictate that a credit reporting agency's dissemination of *any* inaccurate information to third parties constitutes a concrete injury sufficient to establish Article III standing Rather, *TransUnion* holds that because the dissemination of information labeling class members as potential terrorists inflicts a harm similar to that suffered when a defamatory statement subjects a person to hatred, contempt or ridicule, the affected class members had suffered a concrete injury and thus had standing to sue. And in *Spokeo, Inc. v. Robins*, the Supreme Court made clear that not all inaccuracies cause harm or present any material risk of harm.

> [T]he dissemination of false information alleging a person is a 'potential terrorist' is very different from the inconsistencies at issue here. Incorrect address information, a one-year disparity in birth year, and slight variations of the appellant's name are the types of inaccuracies that do not, without more, work any concrete harm by virtue of their dissemination alone.

*Id.* at 4, ¶ 3-16 (internal citations and quotations omitted) (cleaned up); *see also*, *Torres*, No. 1:21-

CV-2056, 2024 WL 3297843, at *5–6 (citing *TransUnion*, 594 U.S. at 433) (emphasis in original)

(noting that "*TransUnion* involved consumers who had been labeled as a 'match' or 'potential

match' to someone on the OFAC list . . . [and,] [a]ccording to those cases, a jury could find the

use of 'match' or 'potential match' misleading when the credit reporting agency had additional

information indicating that the applicant was not, in fact, on the OFAC list[,]" and finding that

because "the OFAC Indicators [in the instant case] did not identify [plaintiff] as a 'match' or a

'potential match' to someone on the OFAC list. . . . [t]o the contrary, they merely stated that 'the

ID provided is *similar to* an individual on the OFAC list[,]'" the OFAC alert was not "inaccurate");

*Wan v. Trans Union LLC*, No. 22-CV-115, 2022 WL 955290, at *1–2 (E.D.N.Y. Mar. 30, 2022)

(holding plaintiff lacked standing under the FCRA where the Complaint contained no allegations

"about dissemination of inaccurate information to third parties"); *Maddox*, 19 F.4th at 65 (quoting

Restatement of Torts § 577 cmt. B) (emphasis added) ("This distinction from *TransUnion* is

critical, as it is self-evident that 'unless the *defamatory matter* is communicated to a third person there has been no loss of reputation.'"); *Cf. Cortez v. Trans Union, LLC*, 617 F.3d 688, 708–09 (3d Cir. 2010) ("The alert on Cortez's credit report does not state that the names are 'similar' to someone on the SDN List or that a match is 'possible.' It reported a 'match' with someone on the SDN List.").

*Second*, Khalil has not made specific enough allegations of reputational and/or monetary harm sufficient to confer standing under *TransUnion*. Rather, he merely alleges, in a conclusory fashion, that "[a]s a result of Experian's inaccurate and incomplete reporting of the OFAC information, [he] sustained damages including harm to reputation and emotional distress." *See* ECF No. 99-1 at ¶¶ 52-58; ECF No. 101 at 14 (identifying that Khalil "makes no allegation that Whittier paid any mind to the OFAC information" and arguing the OFAC information "appears not to have had any consequences of any kind," suggesting "that Whittier either did not read, understand, or consider that information."); *see e.g.*, *Fernandez v. RentGrow, Inc.*, 116 F.4th 288 (4th Cir. 2024) (holding tenant applicant failed to demonstrate that misleading information regarding applicant's possible match to person on OFAC list contained in tenant screening report was "read and understood, or otherwise considered," by landlord or any other third party, as would be required for provision of such information to constitute a concrete injury); *Maddox*, 19 F.4th at 65 ("The misleading record may have been public and available to all; but, so far as is known, it was read by no one. The public nature of the record is not analogous to the dissemination of the credit reports in *TransUnion*[,] [where] [t]here could be no doubt that the third-party businesses viewed those credit reports."); *TransUnion*, 141 S. Ct. at 2210 (defamation "generally require[s] evidence that the document was actually read and not merely processed[.] That evidence is lacking here."); *Wan*, No. 22CV115PKCJRC, 2022 WL 955290, at *1-2 (plaintiff's allegations defendants

"compiled, issued, assembled, transferred, published, and otherwise reproduced consumer reports regarding [p]laintiff to one or more third parties that were false, misleading, and inaccurate" in violation of the FCRA, resulting in "emotional and actual damages, including severe anxiety and limited credit opportunities," and "mental anguish, humiliation, and embarrassment" were insufficient to confer standing); *Zlotnick*, 583 F. Supp. 3d at 391–92 ("Plaintiff does allege that he suffered 'mental and emotional pain,' however such conclusory assertions do not confer standing. Although there may be instances where emotional harm satisfies the Article III injury-in-fact requirement, such claims must be supported by sufficient allegations."); *Spira*, No. 21-CV-2367 (KMK), 2022 WL 2819469, at *5 ("While, technically speaking, Plaintiff has alleged that the allegedly inaccurate information as to his HSBC account was disseminated to a third party— Equifax" his allegations that he "suffered damage for the loss of credit, loss of the ability to purchase and benefit from credit, a chilling effect on future applications for credit, and the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials" failed to "demonstrate that he suffered any concrete harm."); *Gross*, 607 F. Supp. 3d at 273 (same).

The deficiencies of Khalili's allegations become readily apparent when compared to those of Plaintiff Alvarez. The Complaint specifically alleges:

> Alvarez sought to purchase a house[,] and sought mortgage financing through Carrington Mortgage[.] On or about April 26, 2018, Experian sold a consumer report about [Alvarez] [to] Carrington Mortgage[.] In connection with the April 26, 2018 consumer report, Experian received Plaintiff's full name, data of birth, address, and social security number, and included on its April 26, 2018 report information pursuant to its OFAC Name Matching Service, *stating that "Name Matches OFAC/PLC/FSE LIST."* A representative of Carrington Mortgage subsequently informed Plaintiff that it could not move forward with the loan because of the appearance of the OFAC information on the consumer report. As a result of Experian's "inaccurate and incomplete reporting of the OFAC information," Alvarez was forced to delay closing on the property for approximately six (6) weeks and incur out of pocket costs including additional rent payments, and also sustained other damages including harm to reputation and emotional distress.

*See* ECF No. 1 at ¶¶ 37-51 (emphasis added).

30

Alvarez's allegations are, by stark contrast, sufficient to confer standing under *TransUnion* and its progeny because they allege Experian disseminated defamatory information about him (*i.e.*, that he was an OFAC "match") to a third-party creditor, Carrington, which resulted Carrington's ultimate denial of his loan application, in addition to specified monetary damages, reputational harm, and emotional distress. *See* ECF No. 101 at 13 (citing ECF No. 99-2 at ¶ 51) (the PAC contains "no allegation that the consumer report Experian supposedly delivered to Whittier resulted in any adverse action against Khalil, such as a denial of credit. . .  [n]or does Khalil allege any other kind of monetary harm; he does not claim (for instance) that he was forced to delay closing on his property and incurred additional rent expenses because of an allegedly false consumer report, as Alvarez does."); *see e.g., Cortez*, 617 F.3d at 708–09 (finding standing where plaintiff alleged "Trans Union provided the credit report with the OFAC alerts to the dealership in response to receiving identifying information about a specific consumer," plaintiff, and "[t]he dealership relied upon the information about [plaintiff] that Trans Union provided to determine whether or not to finance her car purchase.").

Accordingly, because Prospective Plaintiff Khalil "has failed to allege any concrete injury, [he] does not have Article III standing and this Court lacks subject matter jurisdiction over [his proposed] FCRA claim[,]" and his intervention would therefore be improper. *Wan*, No. 22CV115PKCJRC, 2022 WL 955290, at *2; *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 62 (2d Cir. 2012) ("If plaintiffs lack Article III standing, a court has no subject matter jurisdiction to hear their claim.").

### B.    <u>Personal Jurisdiction</u>

"As a general rule, an applicant for permissive intervention must establish an independent ground of jurisdiction." *Nat'l Am. Corp. v. Fed. Republic of Nigeria*, 425 F. Supp. 1365, 1368

(S.D.N.Y. 1977); *Reedsburg Bank v. Apollo*, 508 F.2d 995 (7th Cir. 1975) ("The general rule is that permissive intervention in an *in personam* action other than a class action must be supported by independent grounds of jurisdiction...."); *Carlson v. United Nat. Foods, Inc*., No. C20-5476-JCC, 2021 WL 3616786, at *4 (W.D. Wash. Aug. 14, 2021); *United States v. Hooker Chemicals & Plastics Corp.*, 101 F.R.D. 451, 458 (W.D.N.Y.), *aff'd*, 749 F.2d 968 (2d Cir. 1984) ("When an applicant is not entitled to intervene as a matter of right in an existing lawsuit, he cannot add his own causes of action unless these are supported by independent jurisdictional grounds.").

In "federal question cases where the federal statute at issue does not contain its own jurisdictional provision" here, the FRCA, "personal jurisdiction is determined in accordance with the laws of the forum state." *Henkin v. Gibraltar Priv. Bank & Tr. Co.*, No. CV 16-5452, 2018 WL 557866, at *2 (E.D.N.Y. Jan. 22, 2018); *see also Shostack v. Diller,* No. 15CIV2255, 2016 WL 958687, at *2 (S.D.N.Y. Mar. 8, 2016) (determining personal jurisdiction under New York law in federal question case alleging claims under, *inter alia,* the FCRA). Thus, the Court first looks to New York law for the purpose of determining personal jurisdiction over Experian in New York. Then, the Court evaluates whether the "exercise of jurisdiction under state law satisfies federal due process requirements of 'fair play and substantial justice.'" *Mortg. Funding Corp. v. Boyer Lake Pointe, LLC*, 379 F. Supp. 2d 282, 286 (E.D.N.Y. 2005) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)). Under New York law there are two routes for a court to exercise personal jurisdiction – general and specific. The Court considers each in turn.

### 1.    **General Jurisdiction**

The Court considers this issue in light of the Supreme Court's pronouncements in *Daimler* and *Goodyear*, where the Court stated that other than in the "exceptional case," the exercise of general jurisdiction is confined to a corporation's "place of incorporation and principal

place of business." *See Aybar v. Aybar*, 177 N.E.3d 1257, 1265 (N.Y. 2021) (citing *Daimler AG v. Bauman*, 571 U.S. 117 (2014); *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915 (2011)). Here, the PAC does not allege Experian's state of incorporation, and it alleges that Experian's principal place of business is in Costa Mesa, California. *See* ECF No. 99-1 at ¶ 8 ("Defendant Experian [] is a consumer reporting agency that regularly conducts business in the State of New York, and which has a principal place of business located in Costa Mesa, California."). Therefore, following review of the PAC, the undersigned finds this Court lacks general jurisdiction over Experian.

## 2.   **Specific Jurisdiction**

"Specific jurisdiction exists when a State exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum." *Chufen Chen v. Dunkin' Brands, Inc.*, No. 17CV3808CBARER, 2018 WL 9346682, at *5 (E.D.N.Y. Sept. 17, 2018), *aff'd*, 954 F.3d 492 (2d Cir. 2020) (internal citations omitted). "The inquiry focuses on the relationship among the defendant, the forum, and the litigation." *Id*. (internal citations omitted). Relevant here, "[u]nder the reasoning of [the Supreme Court's decision in *Bristol-Myers Squibb Co. v. Superior Ct.*, 137 S. Ct. 1773 (2017) ("*Bristol-Myers*")[9]], each named plaintiff in a purported class action must show that in-state contacts specific to their claim give rise to specific jurisdiction over an out-of-state defendant[:]"

> This reading of *Bristol-Myers* comports with the weight of district court authority on the subject. From a constitutional perspective, the Court sees no meaningful difference between the plaintiffs of a mass tort action and the named plaintiffs of a class action. In both circumstances, to exercise specific personal jurisdiction, a plaintiff must show 'a connection between the forum and the specific claims at issue.'

---

[9] *Bristol-Myers* "held that a state court in a mass tort action could not assert specific personal jurisdiction over a non-resident defendant for claims by non-resident plaintiffs when jurisdiction was based solely on the defendant's in-state contacts with other, resident plaintiffs." *Id*.

*Id.* (citing *Bristol-Myers*, 137 S. Ct. at 1773–74, 1781) (collecting cases) (cleaned up). To this end, "absent general jurisdiction," Prospective Lead Plaintiff Khalil "must establish that his [] claims arise out of or relate to [Experian's] contacts with the State of New York[,] rather than relying on the contacts giving rise to specific jurisdiction with regard to [Plaintiff Alvarez's] claims. *Id.*; *see also* ECF No. 101 at 10-11 (While Alvarez*'s* claims may "clear the bar for personal jurisdiction, as the [PAC] continues to allege that he resides on Long Island, and that a supposedly inaccurate Experian consumer report inhibited his ability to purchase a house in Nassau County . . . Khalil's claims cannot piggyback on Alvarez's.").

Here, the PAC fails to show a connection between "New York and [Experian's] claim-related contacts with [Khalil]." *Chufen Chen*, No. 17CV3808CBARER, 2018 WL 9346682, at *6. The PAC alleges that Khalil resides in Racho Viejo, Texas, and claims that Experian included "information [about him] pursuant to [Experian's] OFAC Name Matching Service" on a consumer report it sold to Whittier in connection with Khalil's efforts to refinance his mortgage. *See* ECF No. 99-1 at ¶¶ 7, 53-55. Although not specified in the PAC, Experian contends that "Whittier has just two locations, one in Whittier, California, and one in Richardson, Texas." *See* ECF No. 101 at 10. The PAC's allegation that Experian "regularly conducts business in the State of New York" (ECF No. 99-1 at ¶ 8) is insufficient on its own to confer specific jurisdiction.[10] *See e.g.*, *Sesay v.*

---

[10] Pursuant to New York's long-arm statute, CPLR 302(a), a court "may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent . . . transacts any business within the state," as long as the Plaintiff's "cause of action aris[es] from" that "transact[ion]." CPLR 302(a). This is known as specific jurisdiction and sometimes referred to as long-arm jurisdiction. To exercise specific jurisdiction through New York's long-arm statute, "two requirements must be met: (1) The defendant must have transacted business within the state; and (2) the claim asserted must arise from that business activity." *Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006) (citing *McGowan v. Smith,* 419 N.E.2d 321 (N.Y. 1981)). "[A] claim 'aris[es] from' a particular transaction when there is 'some articulable nexus between the business transacted and the cause of action sued upon.'" *Sea Tow Servs. Int'l, Inc.,* 472 F. Supp. 2d at 360 (E.D.N.Y. 2007) (quoting *Sole Resort,* 450 F.3d at 103). "To determine whether a party has 'transacted business' in New York, courts must look at the totality of circumstances concerning the party's interactions with, and activities within, the state." *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 105 (2d Cir. 2006). The PAC is silent on Experian's specific business activity in New York, and how

*Equifax Info. Servs. LLC*, No. 23 CIV. 6084 (PAE), 2023 WL 5152700, at *1 (S.D.N.Y. July 28, 2023) (in FCRA context, Plaintiff's allegations that: (i) Equifax is "'a Georgia corporation duly authorized and qualified to do business in the State of New York'" (ii) Equifax "'transacts business [in New York], and the conduct complained of occurred [n New York][,]'" and (iii) Equifax "'is regularly engaged in the business of compiling and maintaining files on consumers on a nationwide basis for the purpose of furnishing consumer reports to third parties'" were "conclusory statements" that did "not specify how [the] [C]ourt ha[d] personal jurisdiction over Equifax."); *Mednik v. Specialized Loan Servicing, LLC*, No. 20-CV-427 (MKB), 2021 WL 707285, at *5 (E.D.N.Y. Feb. 23, 2021) ("[W]hile Plaintiff also alleges that [Defendant] is registered to service loans in New York, that [Defendant] serviced her loan, and that she is a New York consumer, these allegations do not support a finding that [Defendant] purposefully transacted business in New York with respect to her loan pursuant to its New York registration by sending her loan-related communications.").

Moreover, even if Experian transacted business in New York by selling creditors consumer reports, "Plaintiff [Khalil's] FCRA claim for failure to investigate and remove disputed information [from the reports] does not appear to 'arise from' Experian's [sale of the reports] or any other purposeful activity in New York; rather, arises out of [Experian's] failure to correct the erroneous reporting disputed by Plaintiff" – which apparently, based on the PAC's allegations – was committed outside of New York. *See id*. at *6.; *Fischbach Corp. v. United Power Ass'n*, No. 93-CV-5373, 1995 WL 505582, at *2 (S.D.N.Y. Aug. 24, 1995) ("Courts repeatedly have found

---

Khalil's FCRA claim specifically arose from Experian's alleged activity in New York. *See e.g*., *Chufen Chen*, No. 17CV3808CBARER, 2018 WL 9346682, at *6 (holding the amended complaint's allegations that Defendant "enter[ed] into franchise contracts with stores across the nation" failed to show "how the non-resident Plaintiffs' claims arise from or relate to those franchise contracts, particularly those franchise contracts in New York[,]" and noting that "even if the contracts were claim-related, Plaintiffs have failed to show that they are substantial enough to confer specific jurisdiction.").

that a defendant has not 'projected himself' into New York for purposes of CPLR § 302(a)(1) ... where the 'center of gravity' of the transaction was elsewhere."). Accordingly, because Prospective Plaintiff Khalil has "failed to show even one purposeful and relevant 'activity' or 'occurrence that took place in' New York[,]" the Court finds that it lacks personal jurisdiction over Experian with respect to Khalil's claims. *Chufen Chen*, No. 17CV3808CBARER, 2018 WL 9346682, at *6 (quoting *Bristol-Myers*, 137 S. Ct. at 1778) (cleaned up).

### C. <u>Venue</u>

"Venue is proper in, *inter alia,* 'a judicial district in which any defendant resides,' or 'a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated.'" *Henkin v. Gibraltar Priv. Bank & Tr. Co.*, No. CV 16-5452, 2018 WL 557866, at *4 (E.D.N.Y. Jan. 22, 2018) (quoting 28 U.S.C. § 1391(b)). "In assessing venue based on Section 1391(b)(2), 'a two-part inquiry is appropriate" – *first*, the Court identifies "the nature of the claims and the acts or omissions that the plaintiff alleges give rise to those claims, and *second*, "the Court should determine whether a substantial part of those acts or omissions occurred in the district where the suit was filed." *Kim v. Lee*, 576 F. Supp. 3d 14, 23 (S.D.N.Y. 2021), *aff'd*, No. 22-61, 2023 WL 2317248 (2d Cir. Mar. 2, 2023) (quoting *Daniel v. American Bd. of Emergency Medicine*, 428 F.3d 408, 432 (2d Cir. 2005)). "When material acts or omissions within the forum bear a close nexus to the claims, they are properly deemed 'significant' and, thus, substantial." *Id.* at 433. "Where a plaintiff asserts multiple claims . . . involv[ing] multiple different parties . . . venue must be proper as to each party and the fact that a claim for some of the plaintiffs or against some of the defendants arose in a particular district does not make that district a proper venue for parties as to whom the

claim arose somewhere else." *Kim*, 576 F. Supp. 3d at 23–24 (internal citations omitted) (cleaned up).

Here, the Court finds the Eastern District of New York is not the proper venue for Khalil's claims on either basis. "For purposes of venue, a corporation resides in any judicial district 'within which its contacts would be sufficient to subject it to personal jurisdiction if that district were a separate State.'" *Id.* (quoting 28 U.S.C. § 1391(d)). As discussed above (*see supra*, Section II.B), Experian "is not subject to personal jurisdiction in New York" with respect to Khalil's claims, "nor does it reside in the state . . . [t]hus, venue in [this District] is improper under § 1391(b)(1)." *Id.*; *Sesay*, No. 23 CIV. 6084 (PAE), 2023 WL 5152700, at *1–2 ("Other than conclusory statements . . .  plaintiff does not specify how this court has personal jurisdiction over Equifax. Thus, it is unclear whether plaintiff has alleged facts sufficient to show that Equifax resides in this judicial district and, therefore, whether this court is a proper venue for this action under Section 1391(b)(1).").

In addition, while Prospective Plaintiff argues that the events alleged occurred within this judicial district, the PAC "alleges no other facts supporting that statement[,]" rather, the PAC alleges Khalil lives in Texas, and that Experian sold the consumer report related to him to Whittier, which, Experian contends, only has two locations in California and Texas. *Sesay*, No. 23 CIV. 6084 (PAE), 2023 WL 5152700, at *1–2 ("[P]laintiff appears to state that the events alleged occurred within [the Southern District of New York ("SDNY")], but she alleges no other facts supporting that statement. Further, she alleges that she resides in Brooklyn, in Kings County, which lies within the Eastern District of New York, and it appears likely that the events alleged actually occurred in the Eastern District of New York and not in [the SDNY]. Thus, it is not clear that this court is a proper venue for this action under Section 1391(b)(2)."); *see also Henkin*, No.

CV 16-5452, 2018 WL 557866, at *4 ("Venue is also improper under subsection (b)(2) since the events forming the basis for this suit occurred in Florida, not New York."); *Dixon v. Mazda Fin. Servs., Inc.*, No. 21-CV-8920 (LTS), 2021 WL 5853244, at *2 (S.D.N.Y. Nov. 1, 2021) (noting that "[u]nder § 1391(b)(2), in actions brought under the FCRA, the claim arises where the harm occurred[,]" and finding that "[w]hile it is unclear whether Defendant is subject to personal jurisdiction [in the SDNY], it is clear that the United States District Court for the Southern District of Texas, Houston Division, is a proper venue for this action" because "Plaintiff resides in Houston, Texas[,]" and "[i]t is likely therefore that the events giving rise to Plaintiff's claim occurred in that judicial district, and that the relevant documents and witnesses are also located there."). Therefore, the Court concludes that the Eastern District of New York is an improper venue for Prospective Plaintiff Khalil's claims.

## II.   <u>Intervention Under Rule 24</u>

As stated, "[u]nder both provisions of Rule 24, the threshold inquiry is whether the application for intervention is timely[,]" *see Floyd v. City of New York*, 302 F.R.D. at 84, and, therefore, the Court evaluates the "timeliness" factors under Rule 24: "'(1) how long the applicant had notice of the interest before it made the motion to intervene; (2) prejudice to existing parties resulting from any delay; (3) prejudice to the applicant if the motion is denied; and (4) any unusual circumstances militating for or against a finding of timeliness[,]'" to identify whether Prospective Plaintiff has made this threshold showing. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2024 WL 4673877, at *5–6 (quoting *United States v. Pitney Bowes*, 25 F.3d 66, 70 (2d Cir. 1994)). "This timeliness assessment must be evaluated against the totality of the circumstances before the court." *Id*. (internal citations omitted); *Pike Co., Inc. v. Universal Concrete Prod., Inc.*, 284 F. Supp. 3d 376, 395 (W.D.N.Y. 2018) (internal citations

omitted) (cleaned up) ("Although the passage of time must be considered by a court in determining the timeliness of the motion, the mere lapse of time does not render a motion to intervene untimely. Indeed, it is firmly established that the most significant criterion in determining timeliness is whether the delay in moving for intervention has prejudiced any of the existing parties."); *United States v. Yonkers Bd. of Educ.*, 801 F.2d 593, 594–95 (2d Cir. 1986) ("The timeliness requirement is flexible and the decision is one entrusted to the district judge's sound discretion.").

Here, having considered the factors outlined above, the Court finds Prospective Plaintiff Khalil's application to intervene is untimely under Rule 24. *With respect to the first factor*, the instant action was commenced on June 5, 2019 (ECF No. 1), and Experian first moved to compel arbitration on April 4, 2021 (ECF No. 48) and renewed its motion on March 1, 2022 (ECF No. 72), which was subsequently granted by the undersigned on March 15, 2023 (ECF No. 90). It was not until about two weeks after District Judge Seybert affirmed the undersigned's decision, on August 2, 2024, that Prospective Plaintiff finally moved to intervene on August 15, 2024 (ECF No. 99) – approximately four years following commencement of the action, and approximately three years since Plaintiff Alvarez's counsel first became aware there was a chance that "Alvarez would not likely be able to act as class representative."[11] *See* ECF No. 101 at 17 ("Courts assessing

---

[11] The Court notes that "'class action attorneys are expected to locate appropriate class representatives at the inception of the litigation and an attempt to add class representatives years later when the case is at or beyond the class certification stage is untimely.'" *Oliver v. Am. Express Co.*, No. 19-CV-566-NGG-SJB, 2023 WL 4471937, at *4–5 (E.D.N.Y. July 11, 2023) (quoting *Gonzalez v. Diamond Resorts Int'l Mktg., Inc.*, No. 2:18-CV-979, 2020 WL 4925702, at *5 (D. Nev. Aug. 21, 2020) (cleaned up). "Attorneys cannot sit idly by and wait until class representatives 'step forward' or otherwise manifest themselves. Attorneys must make affirmative efforts to find representatives, either through investigation, independent fact finding, discovery, or similar efforts." *Id*. at *5. Here, Khalil is "represented by the same attorneys as the named plaintiff[]" Alavrez "who should have known" that Alavrez was an inadequate class representative years prior to filing Khalil's motion to intervene. *Cahoo v. Fast Enterprises LLC*, 536 F. Supp. 3d 146, 157 (E.D. Mich. 2021), *aff'd sub nom. Cahoo v. SAS Inst., Inc*., 71 F.4th 401 (6th Cir. 2023), and *aff'd sub nom. Cahoo v. SAS Inst., Inc.*, 71 F.4th 401 (6th Cir. 2023) (explaining the "proposed intervenors are represented by the same attorneys as the named plaintiffs, who should have known that three of five of their potential class representatives filed for bankruptcy (opening them to real-party-in-interest defenses), and two of those three entered into consent judgments with the State (raising judicial estoppel defenses)" as early as March 2018,

efforts to intervene in putative class actions . .  have held that intervention should be sought when counsel becomes aware of significant obstacles to the adequacy of the potential class representative."); *Catanzano by Catanzano v. Wing*, 103 F.3d 223, 232 (2d Cir. 1996) (internal citations omitted) ("Among the most important factors in a timeliness decision is the length of time the applicant knew or should have known of his interest before making the motion."); *see also Oliver*, No. 19-CV-566-NGG-SJB, 2023 WL 4471937, at *5 (internal citations omitted) (cleaned up) ("[I]n the class action context, plaintiffs can show sufficient diligence if they move to amend once they become aware of the need to fill a class representative gap. The inquiry is whether plaintiffs knew, or should have known, of the need to fill a class representative gap, well before they brought their motion. As applied here, Plaintiffs could and should have uncovered—at the very latest, by May 2022—any issues with the existing representatives' capacity to serve as class representatives—and their failure to move to amend until November 7, 2022, without explanation, is evidence of a lack of diligence."); *T.C.*, No. 22-CV-5045 (MKV), 2024 WL 689503, at *9 (denying intervention under both provisions of Rule 24 where Plaintiffs' counsel filed the motion to intervene more than a year after they initiated the lawsuit, and, "[m]ore importantly, [where] Plaintiffs' counsel waited long after" it was apparent the existing plaintiffs' claims would "become moot."); *Lindblom v. Santander Consumer USA, Inc*, No. 1:15-CV-00990-BAM, 2019 WL 4640684, at *5 (E.D. Cal. Sept. 24, 2019) ("The parties accordingly knew as early as September 2015 that the question of whether the statute of limitations would bar Plaintiff's claims, thereby making her an arguably inadequate representative, was a major issue in this case. The Intervenors and Plaintiffs [] share the same counsel, and counsel was aware of the statute of limitations

---

yet, "the intervention motions were not filed until August and September 2020" and, therefore, "[t]hat delay is [plaintiffs'] responsibility.")

defense."); *MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc.*, 471 F.3d 377, 390 (2d Cir. 2006) (denying motion to intervene made five months after litigation commenced where: (i) "Visa has known of MasterCard's position that it has prior claim to the sponsorship rights since the time this litigation began in April 2006[;]" (ii) "Visa ha[d] been in contact with FIFA throughout the course of this litigation, and MasterCard's complaint and other filings, including its motion for preliminary injunctive relief filed in June, are publicly available for anyone to access[;]" and (iii) "Visa did not file its motion to intervene until the eve of the preliminary injunction hearing.").

Accordingly, even if "the date most relevant to the timeliness determination in this case" was the date on which Khalil learned Alvarez was being compelled to arbitration, which was on March 15, 2023,[12] his seventeen-month delay in filing a motion to intervene "would weigh heavily against a finding of timeliness." *Hnot v. Willis Grp. Holdings Ltd.*, No. 01 CIV. 6558 (GEL), 2006 WL 3476746, at *4 (S.D.N.Y. Nov. 30, 2006), *aff'd*, 234 F. App'x 13 (2d Cir. 2007). Indeed, "courts have routinely denied intervention where the delay in moving to intervene was comparable to, or shorter than, the delay in this case." *Id.* (collecting cases); *see e.g.*, *In re Holocaust Victim Assets Litig.*, 225 F.3d 191, 198 (2d Cir. 2000) (proposed intervenor's delay of eight months was excessive); *Catanzano by Catanzano*, 103 F.3d at 233 (denying intervention where "[t]he intervention motions at issue on this appeal were not filed until October 24, 1995—at least eighteen months after the proposed intervenors should have known that they could be required to provide aid-continuing against their will by this litigation."); *United States v. Pitney Bowes, Inc.*, 25 F.3d

---

[12] *See Chen-Oster*, No. 10-CV-6950, 2015 WL 4619663, at *6 (internal citations omitted) (cleaned up) ("In cases where the potential intervenor's interest is, at least at the outset, subsumed by that of a representative litigant, the trigger requiring intervention does not occur until it is apparent that the representative no longer protects the intervenor's interest. The relevant circumstance for determining timeliness is when the intervenor became aware that its interest would no longer be adequately protected by the parties."); *Turkmen v. Ashcroft*, No. 02-CV-2307, 2010 WL 3398965, at *4 (E.D.N.Y. June 30, 2010), *report and recommendation adopted*, 2010 WL 3398968 (E.D.N.Y. Aug. 26, 2010) (measuring the timeliness of a motion to intervene in a class action from the time the named plaintiffs settled their claims).

66, 71 (2d Cir. 1994) (affirming denial of intervention where "the evidence before the district court revealed that BAII had constructive knowledge of its interest in the underlying action for at least 15 months, and actual knowledge for eight months before filing its motion to intervene."); *Jones v. Richter,* 97 Civ. 291(JTE), 2001 WL 392079, *2 (W.D.N.Y. Apr. 4, 2001) (denying intervention where movant had "actual knowledge of its claim more than eight months before it moved to intervene"); *D'Amato v. Deutsche Bank*, 236 F.3d 78, 84 (2d Cir. 2001) (appellant had notice of his interest in the instant action well before he filed his intervention motion and that he failed to establish that his motion was timely); *Yonkers Bd. of Ed.,* 801 F.2d at 594 (affirming district court's denial of the motion to intervene as untimely, were proposed intervenors were on notice approximately three months before they filed the motion to intervene).

   *With respect to the second factor*, the Court finds Khalil's intervention would prejudice Experian. "Permitting intervention at this point would force the parties who are directly interested in the subject of the litigation . . . to engage in yet another round of costly and time-consuming litigation." *Tummino*, 260 F.R.D. at 36–37; ECF No. 63 (directing class-certification discovery that this Court previously ordered to be complete by April 26, 2021); *see also* ECF No 101 at 19-20 (the PAC "raise[s] new claims—[Kahlil's] *own*, based on Experian's alleged reporting about him rather than its alleged reporting about Alvarez[,]" and Khalil's intervention would "require the taking of additional discovery into the suitability of Khalil to serve as class representative, which will in a further delay in these proceedings and prejudice to Experian, particularly in terms of additional attorneys' fees and legal expenses."); *Yonkers Bd. of Ed.,* 801 F.2d at 596 ("[I]n making the choice between the possibility of harm to the late-arriving prospective intervenors as against the possible harm to parties who have participated diligently during the pertinent portions of this litigation, it does not strike us as unjust that intervention on the part of the late-arrivers must

42

yield under all of the circumstances herein."); *Hnot*, No. 01 CIV. 6558 (GEL), 2006 WL 3476746, at *5 (finding plaintiffs' delay in intervening would cause substantial prejudice to defendants where: (i) the original complaint was filed over five years ago, (ii) fact discovery had been completed for over two and half years, and (iii) the Court had resolved over seven motions, including several summary judgment motions, a motion to amend the complaint, a motion for sanctions, and a motion to compel nationwide discovery, and further noting that "[g]ranting[the proposed intervenor's] motion would effectively require the Court to start from square one with respect to post-2001 claims, and a final resolution of the claims pertaining to the 1998-2001 period would likely be delayed for many more months, if not years."); *Authors Guild v. Open AI, Inc*., 345 F.R.D. 585, 592 (S.D.N.Y. 2024), *appeal dismissed sub nom. Guild v. Tremblay*, No. 24-1007, 2024 WL 4564683 (2d Cir. Oct. 4, 2024), and *appeal dismissed sub nom. Basbanes v. Microsoft Corp.*, No. 24-1014, 2024 WL 4564684 (2d Cir. Oct. 4, 2024) ("[I]ntervention and dismissal or transfer would disrupt the expedited timeline agreed to by the parties and ordered by this Court … where discovery has already commenced and a schedule for summary judgment briefing has been established."). To this end, the Court finds the delay resulting from Khalil's intervention "would constitute substantial prejudice to [Experian], who ha[s] a legitimate interest in the expeditious resolution of claims that have been pending against it for [over five years]." *Hnot*, No. 01 CIV. 6558 (GEL), 2006 WL 3476746, at *5; *Travis v. Navient Corp.*, 284 F. Supp. 3d 335, 346 (E.D.N.Y. 2018) ("[I]ntervention by proposed intervenors would, as a practical matter, delay or prejudice the adjudication of the rights of defendants.").

By contrast*, as to the third factor*, the Court finds denying intervention would not prejudice Prospective Plaintiff Khalil or any other prospective class member. In fact, "Khalil and other putative class members can likely attain a speedier resolution by bringing individual suits rather

than awaiting the class-certification process." *See* ECF No. 101 at 21-22 (identifying that "if Khalil intervenes, the parties will have to litigate class certification, which will consume years in discovery, motions briefing, and (potentially) interlocutory appeal, and, by contrast, if intervention is denied, Khalil can bring his claims on an individual basis and avoid protracted class-certification disputes – therefore, from a timing perspective, "there is every reason to believe Khalil would be better served by filing an individual lawsuit."). Notably, Khalil as a proposed intervenor "does not have an interest in the outcome of an action with an overlapping putative class prior to any class being certified, and "having failed to establish a cognizable interest, [Khalil] similarly fail[s] to establish that [his] hypothetical interest 'would be impaired or impeded.'" *Authors Guild*, 345 F.R.D. 585, 590–91 (quoting Fed. R. Civ. P. 24(a)) (collecting cases) (a proposed intervenor does not have an interest in the outcome of an action with an overlapping putative class prior to any class being certified). Moreover, "[e]ven if the Court certified a class … [the prospective class members] rights would be deemed protected, and not impaired[,] because classes are only certified after finding that the representative plaintiff would adequately protect the class's interests." *Id*. (citing *Travis*, 284 F. Supp. 3d at 344-45).[13]

    *Finally*, *as to the fourth factor*, the Court finds that unusual circumstances exist that "reinforce the Motion's untimeliness." ECF No. 101 at 22. The instant Motion to Intervene "was not brought by independent third parties who learned of this lawsuit and filed the motion in an

---

[13] The Court further notes that "if Khalil's claims—or the claims of any other putative class member—were timely when [Plaintiff] Alvarez filed suit, they can assert those claims on an individual basis without a statute-of-limitations barrier and their interests would not be impaired." *See* ECF No. 101 at 24-25; *Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538, 539 (1974) (holding the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the requirement of Rule 23(a)(1) been met, and where respondents, who were purported members of the class, made timely motions to intervene after the District Court had found the suit inappropriate for class action status, the institution of the original class suit tolled the limitations statute for respondents).

effort to protect their potential interest . . . [r]ather, [it was] brought by Plaintiffs' counsel in an effort to save their purported class action." *T.C.*, No. 22-CV-5045 (MKV), 2024 WL 689503, at *8. Plaintiffs concede that Khalil sought to intervene following this Court's August 2, 2024 decision affirming the undersigned's Order compelling Alvarez to arbitrate his claims with Experian, and that, he specifically seeks to intervene on behalf of class members without any arbitration agreement and "thereby avoid the significant delay in the resolution of his and those members' claims that waiting for Alvarez to resolve his claims against Defendant in arbitration would otherwise bring about." ECF No. 99 at 7; *see e.g.*, *T.C.*, No. 22-CV-5045 (MKV), 2024 WL 689503, at *8 ("By their own account, Plaintiffs' counsel started 'pursuing adequate class substitutions' when they 'became aware of the potential need to fill a class representative gap after OPWDD placed several of the Plaintiffs into community residences.'"). "In these circumstances, the motion is not timely, and the proposed intervenor[] do[es] not have an interest in this action that may be impaired by its disposition. For these reasons, the Court denies intervention "as of right *and* by permission." *Id.* (quoting *Floyd*, 770 F.3d at 1058) (emphasis in original).[14]

---

[14] "In further support of the Court's discretionary decision to deny permissive intervention, the Court observes that this case is unlikely to meet the requirements for class certification" because Plaintiff Alvarez has been compelled to arbitration and Prospective Plaintiff Khalil lacks standing (*see supra* Section I.A, Fn 6). *See e.g.*, *T.C.*, No. 22-CV-5045 (MKV), 2024 WL 689503, at *8 (noting the Court was "not required to resuscitate [the] case via intervention" and denying intervention where: (i) plaintiffs' counsel had not moved for class certification as of 2024, even though they filed the case as a putative class action in 2022, (ii) the Court "long ago ordered [d]efendants to produce discovery relevant to such a motion[,]" and (iii) the plaintiffs' claims were moot and the intervening plaintiff lacked standing).

## <u>CONCLUSION</u>

For the foregoing reasons, Prospective Plaintiff Ahmad Khalil's Motion to Intervene as Lead Plaintiff (ECF No. 99) is **DENIED**. The in-person Oral Argument on the Motion before the undersigned previously set for December 10, 2024 at 12:00 p.m. is hereby CANCELLED.

Dated:  December 6, 2024                                          **SO ORDERED**:

<u>/S/</u> *James M. Wicks*

                                JAMES M. WICKS
                                United States Magistrate Judge